UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

LIONEL GIBSON,                          )
                                        )
                    Plaintiff,          )
                                        )
            vs.                         )          No. 1:15-cv-01465-WTL-MPB
                                        )
STEVE DONALDSON, *et al.*               )
                                        )
                    Defendants.         )

**Entry Discussing Motion for Summary Judgment**

Plaintiff Lionel Gibson brought this civil rights action pursuant to 42 U.S.C. § 1983.  He

alleges that his constitutional rights were violated by the defendants while he was incarcerated at

Wabash Valley Correctional Facility ("Wabash Valley").  What remains in this action are his First

Amendment retaliation claim and his Eighth Amendment claim against defendants Steve

Donaldson, Rob Marshall, and Superintendent Richard Brown.  Presently pending before the Court

is Mr. Marshall and Superintendent Brown's motion for summary judgment.  Mr. Donaldson

acknowledges that there are genuine issues of material fact regarding Mr. Gibson's claims against

him, thus he has not joined in their motion.  For the reasons explained below, the motion for

summary judgment is **granted in part** and **denied in part**.  Dkt. No. 113.  Superintendent Brown

is entitled to qualified immunity, while Mr. Marshall is not.

**I.**
**Summary Judgment Legal Standard**

Summary judgment is appropriate when the movant shows that there is no genuine dispute

as to any material fact and that the movant is entitled to judgment as a matter of law.  *See* Fed. R.

Civ. P. 56(a).  A "material fact" is one that "might affect the outcome of the suit."  *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  To survive a motion for summary judgment, the

non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.
## Background

The following facts are drawn from either the undisputed evidence or, if disputed, the evidence taken in the light most favorable to Mr. Gibson, as the foregoing standard of review requires.[1] This does not mean that the foregoing facts are true, only that they are taken as such for the purposes of this motion.

On or around June 20, 2013, while housed in the secure housing unit ("SHU") at Wabash Valley, Mr. Gibson met with Mr. Marshall, who was an internal affairs officer, and Assistant Superintendent Frank Littlejohn. Mr. Gibson orally agreed to serve as a confidential informant for them, and was thus transferred to general population. Although Mr. Gibson understood their agreement to include that he would not be the target of any shakedowns, his cell was searched on

---

[1] The defendants point out that certain statements in Mr. Gibson's declaration are not within his personal knowledge and that certain exhibits cited by Mr. Gibson in his response do not stand for the proposition for which they are cited. In the instances where the defendants are correct, the Court did not consider that information in setting forth the relevant facts.

August 27, 2013, with the knowledge of Mr. Littlejohn and Mr. Marshall. Correctional officers found a cellphone and several suboxone strips during the search. Mr. Gibson was immediately transferred back to the SHU and subsequently charged with possessing contraband and found guilty during prison disciplinary proceedings.

Shortly thereafter, on September 2, 2013, Mr. Gibson wrote Assistant Superintendent Littlejohn and Mr. Marshall asking to speak with them. Mr. Marshall responded by letter on September 11, 2013, stating among other things that he does not think Mr. Gibson is "trustworthy," and that "[i]f you have something to report, write it down and forward it to my office." Dkt. No. 134-8 at 1. Mr. Marshall, however, addressed his responsive letter to another inmate's cell.

On September 11, 2013, Mr. Gibson wrote Mr. Marshall again. Mr. Marshall responded six days later, stating among other things that he "had nothing to do with" the search of Mr. Gibson's cell and declining to believe that Mr. Gibson had any worthwhile information to share, stating, "[i]f in fact you do have information, why didn't you include it in this letter?" Dkt. No. 134-9 at 4. Mr. Gibson asserts that, on September 18, 2013, Mr. Donaldson gave Mr. Marshall's responsive letter to another inmate, William O'Brien. As Mr. Marshall and others later acknowledged, other inmates could infer from these communications that Mr. Gibson was attempting to provide information to internal affairs, and this put Mr. Gibson in danger.

Mr. Gibson presents the affidavit of fellow inmate Otis Carr.[2] He attests that he was housed at Wabash Valley with Mr. Gibson and, in September 2013, received a text message from William

_____

[2] The defendants previously moved to strike Mr. Carr's declaration, but the Court denied that motion and concluded that Mr. Carr's declaration would be considered at summary judgment. *See* Dkt. No. 133 at 3. Although the defendants point out in their reply brief that, like Mr. Carr, they were unaware of inmate Theodore Freeman as a witness in this case, they do not move to strike Mr. Freeman's affidavit or otherwise argue that it is inadmissible. Like Mr. Carr's declaration, the Court will therefore consider Mr. Freeman's affidavit below.

O'Brien containing a picture of the confidential correspondence between Mr. Gibson and Mr. Marshall. Other inmates also sent him images of those communications. Mr. Carr also attests that he witnessed Mr. Donaldson yell on the 400 range that Mr. Gibson was a snitch "so that everybody could hear. He told [Mr.] Gibson that it didn't matter who he grieved to and that nothing would stop him from letting the population know it." Dkt. No. 134-30 at 2.

Two days later, Mr. Gibson's sister emailed the Indiana Department of Correction ("IDOC") Commissioner's office, explaining that there was apparently a "mix up with some letters and that [Mr. Gibson] will be killed as soon as he is released from lockup." Dkt. No. 134-12 at 1. She reported that inmates in another IDOC facility in Michigan City, Indiana have copies of these letters and that he is receiving death threats. Her emailed was forwarded to Superintendent Brown, who was informed that Mr. Marshall would speak with Mr. Gibson about the matter.

The next day, on September 21, 2013, Mr. Gibson was confronted and threatened during recreation by other inmates at recreation who had a copy of the second letter he wrote Mr. Marshall and Mr. Marshall's response to it. Mr. Gibson was not at that time in physical danger, however, because in the SHU inmates are physically separated from each other.

After being confronted by other inmates regarding his correspondence with Mr. Marshall, Mr. Gibson wrote to Superintendent Brown and Assistant Superintendent Littlejohn on that same day, September 21, 2013. He expressed concerns for his safety after other inmates had accused him of working for internal affairs, and that they did so after Mr. Donaldson gave a letter to another inmate and "began making remarks about snitches." Dkt. No. 134-10 at 1; *see* Dkt. No. 134-11 at 1. He stated that Mr. Donaldson was doing this to him on purpose, and he requested a transfer to another facility.

Mr. Marshall spoke with Mr. Gibson in person on September 23, 2013. Mr. Gibson told Mr. Marshall that Mr. Donaldson intentionally gave confidential documents to another inmate in order to put his safety at risk. Mr. Gibson informed Mr. Marshall of a specific inmate who had the correspondence at issue, and although a search of the inmate's cell did not locate those documents, when Mr. Gibson was being escorted back to his cell, an inmate yelled at him, "who you out there telling on now?" Dkt. No. 134-14 at 1.

Mr. Marshall spoke with Mr. Donaldson about the issue, and Mr. Donaldson denied giving any other inmates Mr. Gibson's confidential documents and certainly denied doing it intentionally. Mr. Marshall reported to Superintendent Brown that he believed Mr. Gibson is using the mishandled mail issue in order to obtain a transfer to another correctional facility, as Mr. Marshall asserted there was no "proof that these documents were deliberately mishandled or mishandled period." Dkt. No. 134-14 at 1. Mr. Marshall concluded this even though he had addressed his response to Mr. Gibson's confidential correspondence to the wrong cell.

Nevertheless, Mr. Marshall transferred Mr. Gibson to another range (from the A-100 range to the A-300 range). Mr. Donaldson was assigned to the entire A range, and Mr. Gibson wanted to be separated from him. However, Mr. Marshall believed that Mr. Gibson's safety would not be "compromised if he remain[ed] in the SHU," as "the SHU [is] more safe than any other unit or facility." Dkt. No. 134-14 at 1. Mr. Gibson received more threats from inmates on the A range, but he acknowledged that his physical safety was not in jeopardy at that time because everyone in the SHU is locked into their own individual cell.

On October 2, 2013, Mr. Gibson wrote Mr. Marshall another letter about the confidential correspondence. Mr. Marshall responded, stating that they found evidence that other inmates have his confidential correspondence but that there "is no evidence to prove that Mr. Donaldson

intentionally gave your correspondence to another inmate." Dkt. No. 134-17 at 2. Because they found his correspondence circulating among other inmates, prison officials requested that Mr. Gibson be immediately transferred to another facility, as the information in the circulating correspondence "could and most definitely will cause a negative environment for [Mr.] Gibson." Dkt. No. 134-20 at 1.

A facility transfer request was submitted by prison staff member Matt Leohr on October 3, 2013. The explanation provided was as follows: "per internal affairs department, offender's confidential mail was placed in the wrong mailbag in the SHU at [Wabash Valley] causing offender's life to be in danger." Dkt. No. 134-21 at 1. Superintendent Brown filled out another facility transfer request on October 15, 2013. The reason given for the request on this form did not mention the confidential mail issue, but instead circled reasons "overall negative adjustment" and "departmental needs." Dkt. No. 134-23 at 1. In response to a letter from Mr. Gibson, Mr. Marshall explained to him that this is still a transfer request and that he will most likely go to Westville Correctional Facility ("Westville"). A week later, on October 22, Superintendent Brown signed off on another facility transfer request, and the reason given was "due to release of information" and that Mr. Gibson was a "threat to institutional security." Dkt. No. 134-24 at 1.

Mr. Gibson filed a grievance against Mr. Donaldson on November 19, 2013. Mr. Gibson asserts that Mr. Donaldson continued to walk other inmates passed his cell so that they could accuse him of being a snitch.

Mr. Gibson wrote to Mr. Marshall on November 26, 2013, asking why he was moved from cell A-302 to A-402. He informed Mr. Marshall that he had no problems in the 300 range, but in the 400 range there are people who know about the confidential correspondence and they are harassing him about it. Mr. Marshall responded that internal affairs had nothing to do with his cell

transfer and that he should contact his unit team with these questions. However, Mr. Marshall again addressed the correspondence to the wrong cell, sending it to A-302 rather than Mr. Gibson's new cell, A-402. But, on this occasion, no confidential information was in Mr. Marshall's response.

In December 2013, Mr. Gibson wrote to his Counselor, Ms. Ammerman, asking about the proper procedures for handling confidential and legal mail. She responded to his questions, informing him that confidential mail, such as that from internal affairs to an inmate, is supposed to be hand delivered by her to the inmate in person instead of being placed in the mailbag. She repeatedly made clear that such confidential correspondence is delivered only by her, not through the normal mail process. *See* Dkt. No. 134-26 at 1-2.

Mr. Gibson filed another grievance regarding Mr. Donaldson's continued conduct on February 9, 2014. Mr. Gibson asserted that Mr. Donaldson himself came by his cell to taunt him and call him a snitch. Mr. Marshall responded to the formal grievance filed by Mr. Gibson about this issue, stating it is the first time he has heard of such harassment by Mr. Donaldson. He concluded that he has no way to prove verbal harassment and that Mr. Gibson's complaints "do not warrant an internal investigation," as a supervising lieutenant had been contacted about the issue and assured Mr. Marshall that Mr. Gibson's complaints had been addressed and remedied. Dkt. No. 134-27 at 1. Although complaints such as Mr. Gibson's were considered by Superintendent Brown when considering whether to promote Mr. Donaldson, he was promoted to Sergeant despite them.

In March 2014, Mr. Gibson's fiancé called and complained to prison officials that Mr. Gibson had still not been transferred out of Wabash Valley. After the call, Superintendent Brown facilitated a speedier transfer for Mr. Gibson, and he was transferred to Westville in March 2014.

Mr. Gibson was harassed by inmates at Westville who knew about what had occurred at Wabash Valley, including by inmates who used to be housed at Wabash Valley. But Mr. Gibson acknowledged that he was never in physical danger at Westville since he remained in segregated housing when he was transferred there. Before he was transferred out of Westville, Mr. Gibson discussed his concerns about what happened at Wabash Valley with prison official Evan Lowry. In September 2014, Mr. Lowry reached out to Mr. Marshall about Mr. Gibson's concerns. Mr. Marshall informed Mr. Lowry that there could be concerns about Mr. Gibson's safety because confidential correspondence was "inadvertently circulated to the offender population." Dkt. No. 115-1 at 12.

Mr. Gibson's disciplinary housing sanction ended, and he was subsequently transferred from Westville to New Castle Correctional Facility ("New Castle"). Inmate Mr. O'Brien, who originally circulated the confidential correspondence between Mr. Gibson and Mr. Marshall, was then transferred from Wabash Valley to New Castle. Mr. Gibson presents an affidavit from inmate Theodore Freeman, who attests that he was in the SHU at Wabash Valley when Mr. O'Brien was transferred to New Castle, and he witnessed Mr. Marshall meet with Mr. O'Brien before the transfer. Mr. Marshall also met with Mr. Freeman, asking if he knew Mr. Gibson. Mr. Marshall told Mr. Freeman that if he agreed to circulate the confidential correspondence between he and Mr. Gibson that Mr. Marshall would release him from the SHU and transfer him to New Castle. Mr. Marshall told Mr. Freeman that he wanted Mr. Gibson harmed and would "do special favors if that could be arranged." Dkt. No. 134-29 at 2. Although Mr. Freeman did not agree to harm Mr. Gibson, he did accept three different letters between Mr. Marshall and Mr. Gibson.

While at New Castle, on January 11, 2016, Mr. Gibson engaged in a physical altercation with two other inmates. Mr. Gibson adduces evidence that the altercation was caused by the

confidential correspondence that continued to circulate among inmates in IDOC.  Mr. Freeman attests that Mr. Gibson was attacked by members of a gang because of the confidential correspondence.

Mr. Gibson was charged in a prison disciplinary proceeding with assault as a result of his participation in the altercation in January 2016 at New Castle.  At the disciplinary hearing, Mr. Gibson admitted to fighting with two other inmates, and he said that the fight occurred due to a dispute over a borrowed legal book.

During his deposition in this action, however, Mr. Gibson gave a more detailed description of what led to the incident.  He stated that one of the inmates he fought with, Mr. Kyner, let him borrow a legal book before Mr. Kyner was aware of the confidential documents circulating.  Mr. Kyner asked for the book back, so Mr. Gibson gave it to a correctional officer to return to Mr. Kyner, but Mr. Kyner never received it.  The correctional officer stated that he lost the book, so Mr. Gibson told Mr. Kyner that he would replace the book, and Mr. Gibson ultimately paid another inmate, Mr. Carter, as he had loaned the book to Mr. Kyner.  The law library eventually obtained another copy of the book, and Mr. Gibson thought he was entitled to use it given that he paid for the lost book.  In the meantime, "friction" was created between Mr. Gibson and Mr. Kyner and Mr. Carter because they found out about "the William O'Brien thing."  Dkt. No. 117 at 19. Eventually, between that "friction" and the continuing dispute about the book, Mr. Gibson fought with Mr. Kyner and Mr. Carter.

## III.
## Discussion

The defendants move for summary judgment on Mr. Gibson's First and Eighth Amendment claims against Superintendent Brown and Mr. Marshall.  Both defendants raise the defense of qualified immunity.  The Court will first set forth the legal standards governing the qualified-

immunity defense, before analyzing in turn whether the defense applies to each claim against each defendant.

"[Q]ualified immunity is *immunity from suit* rather than a mere defense to liability." *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 988 (7th Cir. 2012) (emphasis in original) (citation and quotation marks omitted). It gives "government officials 'the benefit of legal doubts.'" *Rooni v. Biser*, 742 F.3d 737, 743 (7th Cir. 2014) (quoting *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991)); *see Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) ("Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties.").

"To determine whether a defendant is entitled to qualified immunity, courts must address two issues: (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at 742 (citation omitted). "If the answer to either question is no, the officer is immune from suit." *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 598 (7th Cir. 2011). The Court may decide these factors in either order. *See Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012).

## A.     Eighth Amendment Claim

A prison official is liable for failing to protect an inmate from another inmate if the official "knows of and disregards an excessive risk to inmate health or safety[.]" *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Establishing that a prison official was deliberately indifferent to such a risk requires proving both an objective and a subjective component. *Id.* at 834. "First, the harm to which the prisoner was exposed must be an objectively serious one." *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). Second, "the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he 'must both be aware of facts from

which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). However, direct evidence of the official's state of mind is not required: "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

Superintendent Brown and Mr. Donaldson both argue that they are entitled to summary judgment because they acted reasonably in response to known risks to Mr. Gibson. That is, they do not argue that the distribution of the confidential correspondence did not create a serious risk that Mr. Gibson would by attacked by other inmates, but they contend that they were not deliberately indifferent to that risk. The Court will address in turn whether each defendant is entitled to qualified immunity on Mr. Gibson's Eighth Amendment claim.

### 1. *Superintendent Brown*

The evidence taken in the light most favorable to Mr. Gibson shows that Superintendent Brown is entitled to qualified immunity, as there is no evidence of an Eighth Amendment violation, let alone a violation of clearly established law. *See Rooni*, 742 F.3d at 742.

As a general matter, there is no evidence that Superintendent Brown was involved with mail distribution and thus the leaking of Mr. Gibson's confidential correspondence to other inmates. Superintendent Brown first became aware of the issue when he was forwarded an email sent by Mr. Gibson's sister to the IDOC Commissioner's Office expressing concern for Mr. Gibson safety. Superintendent Brown was then informed that Mr. Marshall would speak with Mr. Gibson about the matter. The next day, Mr. Gibson wrote to Superintendent Brown expressing concern about his safety after Mr. Donaldson gave confidential communications to another offender and labeled Mr. Gibson a snitch. Among other things, Mr. Marshall informed Superintendent Brown

that he transferred Mr. Gibson to another range in the SHU, away from an inmate who called him a snitch, and, more importantly, that Mr. Gibson's safety would not be "compromised if he remain[ed] in the SHU," as "the SHU [is] more safe than any other unit or facility." Dkt. No. 134-14 at 1. Mr. Gibson acknowledges that this is true; his physical safety was not in jeopardy in the SHU since everyone is locked into their own cell.

Superintendent Brown's only other significant involvement with Mr. Gibson's situation was the submission of transfer requests, asking that Mr. Gibson be transferred to another correctional facility. Although Mr. Gibson makes much of the fact that Superintendent Brown provided a different reason on the two transfer requests he submitted for Mr. Gibson, *see* Dkt. No. 134-23; Dkt. No. 134-24, this fact does not itself demonstrate deliberate indifference to any risk of harm to Mr. Gibson. As noted above, Superintendent Brown knew Mr. Gibson was in the SHU during this time and safe from other inmates. After significant delays and a call by Mr. Gibson's fiancé, Superintendent Brown facilitated a speedier transfer for Mr. Gibson, and he was shortly thereafter transferred to Westville.

Nothing about Superintendent Brown's involvement in Mr. Gibson's situation would permit a reasonable jury to conclude that he knew "of and disregard[ed] an excessive risk to [Mr. Gibson's] health or safety[.]" *Farmer*, 511 U.S. at 837. He ensured that Mr. Gibson was in the SHU at Wabash Valley and thus safe from other inmates, and he facilitated a transfer to another correctional facility, which was also for Mr. Gibson's safety. Rather than disregarding a risk to Mr. Gibson's safety, Superintendent Brown appropriately responded to the known risk, which precludes an Eighth Amendment violation. *See Lambert v. Buss*, 498 F.3d 446, 452 (7th Cir. 2007) ("There is no liability under the Cruel and Unusual Punishments Clause if a prison official has responded reasonably to a risk of harm." (citation and quotation marks omitted)); *see also Farmer*,

511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

Because Mr. Gibson has failed to establish that Superintendent Brown violated his Eighth Amendment rights, Superintendent Brown is entitled to qualified immunity. *See Rooni*, 742 F.3d at 742.

### 2. *Mr. Marshall*

Mr. Gibson presents significant evidence regarding Mr. Marshall's involvement in the distribution of the confidential correspondence and his investigation of Mr. Gibson's complaints about them. Much of it is relevant to placing Mr. Marshall's actions in context, but the Court focuses here on the specific facts salient to whether a reasonable jury could conclude that Mr. Marshall violated clearly established Eighth Amendment law.

The evidence, taken in the light most favorable to Mr. Gibson, shows that Mr. Gibson agreed with Mr. Marshall to serve as a confidential informant and, during this service, would not be the target of any cell shakedowns. Nevertheless, with Mr. Marshall's knowledge, Mr. Gibson's cell was searched and contraband was found. After Mr. Gibson asked to speak with Mr. Marshall, Mr. Marshall sent a response to Mr. Gibson's confidential correspondence via his mailbag—the contents of which would place Mr. Gibson at risk—to the wrong cell. This mail, however, was supposed to be hand delivered like legal mail, rather than placed in the mailbag to the wrong cell. Shortly thereafter, other inmates had a copy of at least one of Mr. Gibson's letters to Mr. Marshall and Mr. Marshall's responses to them. Not only was Mr. Marshall aware of this, but he also knew that other inmates were threatening Mr. Gibson because of it. Nevertheless, while at Wabash Valley, Mr. Gibson was never in physical danger from other inmates because he was in the SHU.

Mr. Gibson was transferred to Westville, and Mr. Marshall informed Mr. Lowry, who worked at Westville, that Mr. Gibson's safety could be in jeopardy even at Westville because inmates had copies of his confidential correspondence. Mr. Gibson was subsequently transferred to New Castle. Mr. Marshall knew of this because he told Mr. Freeman, then an inmate at Wabash Valley, that if Mr. Freeman agreed to circulate Mr. Gibson's confidential correspondence he would be released from the SHU and transferred to New Castle. Mr. Marshall told Mr. Freeman that he wanted Mr. Gibson harmed and would "do special favors if that could be arranged." Dkt. No. 134-29 at 2. Although Mr. Freeman did not agree to harm Mr. Gibson, he did accept three different pieces of confidential correspondence between Mr. Marshall and Mr. Gibson.

Mr. Gibson was in an altercation at New Castle in January 2016. Although during the disciplinary hearing Mr. Gibson stated that the fight occurred over a book, Mr. Gibson explained that the altercation was in part caused by the confidential correspondence, as only after the other inmates found out about the confidential correspondence did the book become a serious issue.

The foregoing evidence, taken in the light most favorable to Mr. Gibson, shows that not only did Mr. Marshall used the incorrect mail procedure to deliver confidential correspondence, but he addressed the mail to the wrong cell. A reasonable jury could conclude that this was done intentionally to inform other inmates that Mr. Gibson was an informant and create a serious risk of harm to him, especially given Mr. Marshall's clear frustration with Mr. Gibson in the correspondence. But even more critically, the evidence shows that Mr. Marshall went to great lengths to continue distributing the confidential correspondence and soliciting inmates such as Mr. Freeman to harm Mr. Gibson even after Mr. Gibson had left Wabash Valley. This evidence shows not only that Mr. Marshall knew "of and disregard[ed] an excessive risk to [Mr. Gibson's] health

or safety," *Farmer*, 511 U.S. at 837, but that he also maliciously and actively participated in creating the risk of harm.

The defendants resist this conclusion. They argue that even if the elements of an Eighth Amendment claim as set forth in *Farmer* are met, Mr. Gibson was not actually assaulted because of the confidential correspondence, and thus he cannot recover any damages from Mr. Marshall. This argument is unpersuasive for two distinct reasons.

First, although the defendants are correct that Mr. Gibson did not state during his prison disciplinary hearing that the fight at New Castle occurred due to other involved inmates' knowledge of the confidential correspondence, that does not preclude his deposition testimony in this action that the confidential correspondence was a factor. Indeed, in his deposition he explains how both the confidential correspondence and the dispute over a legal book led to the altercation. A reasonable jury could believe Mr. Gibson's explanation and conclude that the altercation was a foreseeable result of Mr. Marshall's involvement in the distribution of the correspondence. After all, Mr. Marshall acknowledged that Mr. Gibson was at risk even after he left Wabash Valley, and Mr. Marshall continued to encourage an assault to occur.

Second, even if a physical altercation had not occurred, Mr. Gibson's fear of physical assault from the outset is sufficient under the specific circumstances presented here. This is because Mr. Marshall intentionally helped create the fear of assault by his extreme and, as an IDOC employee, officially-sanctioned conduct, and this conduct caused psychological harm even after Mr. Gibson was transferred to other correctional facilities.

It is true that the requirements set forth in *Farmer* only speak to the duty owed by prison officials to inmates in failure-to-protect cases; they do not speak to the "injury element." *Babcock v. White*, 102 F.3d 267, 271 (7th Cir. 1996). And the injury element is met in the typical failure-

to-protect case by "the reasonably preventable assault itself, rather than any fear of assault." *Id.*;
*see Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997) ("An allegation that prison officials exposed
a prisoner to a risk of violence at the hands of other inmates, does not implicate the Eighth
Amendment's Cruel and Unusual Punishments Clause." (citation and quotation marks omitted)).

But in *Welborn* and *Babcock*, the Seventh Circuit did not entirely foreclose claims where
no physical injury occurred. They held that the plaintiff's in those cases could not establish the
injury element because they did not provide evidence of "physical harm *nor the kind of extreme
and officially sanctioned psychological harm* that might support a claim for damages under the
Eighth Amendment." *Welborn*, 110 F.3d at 524 (emphasis added); *see Babcock*, 102 F.3d at 273
(holding that the plaintiff's "allegations of deliberate indifference do not exemplify the egregious
conduct" causing psychological harm "sufficient to entitle him to damages under the Eighth
Amendment"); *see also Whiteside v. Pollard*, 481 Fed. Appx. 270, 272 (7th Cir. 2012) (holding
that the plaintiff did not present evidence that the defendants exposed him to a risk of harm "out
of malice, which [he] needed to demonstrate in order to establish a failure-to-protect claim"); *Age
v. O'Brien*, 2000 WL 307396, *2 (7th Cir. Mar. 23, 2000) ("Though [the plaintiff] may fear an
assault by the Mexican Mafia or others, a successful claim for damages under the Eighth
Amendment requires proof of obvious physical injury or of extreme and officially-sanctioned
psychological harm, neither of which is present here."). The defendants recognize this limited
exception to the physical-injury requirement set out in *Babcock* and *Welborn*. *See* Dkt. No. 114
at 11 (arguing that physical harm is required, "absent a showing of the officials' malicious or
sadistic intent").

The evidence taken in the light most favorable to Mr. Gibson shows that the limited
exception is met. This is not a typical Eighth Amendment failure-to-protect claim. Instead of

failing to protect Mr. Gibson from a risk of assault created by a third-party, Mr. Marshall intentionally created the risk. Such "extreme and officially sanctioned," *Welborn*, 110 F.3d at 524, and "egregious," *Babcock*, 102 F.3d at 273, conduct violates the Eighth Amendment regardless of whether a physical assault eventually occurs.

Having concluded that a constitutional violation occurred, the Court must examine the second qualified immunity element—that is, "whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at 742 (citation omitted). "To be clearly established at the time of the challenged conduct, the right's contours must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right,' and 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013) (quoting *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012)). That being said, "a case directly on point is not required for a right to be clearly established and 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Abbott v. Sangamon Cnty., Ill*, 705 F.3d 706, 731 (7th Cir. 2013) (quoting *Phillips v. Community Ins. Corp.*, 678 F.3d 513, 528 (7th Cir. 2012)). Specifically, a plaintiff "must either (1) present case law that has articulated both the right at issue and applied it to a factual circumstance similar to the one at hand or (2) demonstrate that the contours of the right are so established as to make the unconstitutionality obvious." *Ault v. Speicher*, 634 F.3d 942, 946 (7th Cir. 2011).

Mr. Gibson has not pointed to case law involving a similar factual scenario to the one presented here. But, as noted, "a case directly on point is not required." *Abbott*, 705 F.3d at 731. Indeed, the Seventh Circuit held in *Gevas* that the defendants were not entitled to qualified immunity on the plaintiff's Eighth Amendment claim even though a factually similar case was not

present because "[a] prison official could not logically believe, in view of the duty imposed on him by the Eighth Amendment, *Farmer*, and other deliberate indifference cases" that their conduct was constitutional. 798 F.3d at 485.

Although this case is factually distinct from *Gevas*, the same reasoning applies here. *Farmer* and subsequent Eighth Amendment cases make clear that prison officials "have the duty to protect a prisoner once they become aware he is in danger of assault by another prisoner." *Id.* at 484. And *Welborn* and *Babcock* hold that extreme, officially sanctioned, or egregious conduct that places an inmates at risk violates the Eighth Amendment. *Welborn*, 110 F.3d at 524; *Babcock*, 102 F.3d at 273. This case presents such behavior by Mr. Marshall, as Mr. Marshall was not only aware of the danger to Mr. Gibson, he helped Mr. Donaldson create it and, worse still, attempted to recruit other inmates to assault Mr. Gibson even after Mr. Gibson was transferred to another correctional facility. Between *Farmer*, *Babcock*, and *Welborn*, the "unconstitutionality" of Mr. Marshall's conduct was "obvious." *Ault*, 634 F.3d at 946.

In sum, the qualified-immunity inquiry asks "whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). It would certainly have been clear to a reasonable correctional officer in Mr. Marshall's position that intentionally distributing confidential correspondence to create a risk that an inmate would be assaulted and soliciting inmates to assault him is unlawful. Accordingly, Mr. Marshall is not entitled to qualified immunity on Mr. Gibson's Eighth Amendment claim.

## B.     First Amendment Retaliation Claim

To state a First Amendment claim for retaliation, a plaintiff must allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would

likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015). The factual basis for these claims significantly overlaps that for Mr. Gibson's Eighth Amendment claims. The Court will thus address the defendants' qualified-immunity defense together, as the analysis largely tracks the analysis of the Eighth Amendment claims.

As to the first element, Mr. Gibson maintains that he engaged in a protected activity when he wrote to Mr. Marshall and Superintendent Brown regarding what Mr. Gibson believed to be a violation of the agreement that he would work as an informant for internal affairs. The defendants do not dispute that this constitutes an activity protected by the First Amendment, and thus the Court accepts this element as met.

Mr. Gibson's claim against Superintendent Brown, however, fails on the second element. As detailed above with respect to Mr. Gibson's Eighth Amendment claim, there is no evidence that Superintendent Brown was involved with mail distribution and thus the leaking of Mr. Gibson's confidential correspondence to other inmates. And his only other involvement was to direct Mr. Gibson's complaints to be investigated and, ultimately, to request that he be transferred for his safety, which Mr. Gibson himself wanted. In short, there is thus no evidence that Superintendent Brown took any action adverse to Mr. Gibson, and therefore Mr. Gibson was not subject to "a deprivation that would likely deter First Amendment activity" by Superintendent Brown. *Perez*, 792 F.3d at 783. Because Mr. Gibson cannot establish that Superintendent Brown violated his First Amendment rights, he is entitled to qualified immunity. *See Rooni*, 742 F.3d at 742.

Mr. Gibson, however, has established that Mr. Marshall subjected him to "a deprivation that would likely deter First Amendment activity." *Perez*, 792 F.3d at 783. Certainly, having his confidential correspondence distributed to other inmates, which would lead him to be labeled a snitch and be at risk of assault, would likely deter First Amendment activity.

This leaves the third element—that is, whether Mr. Gibson's complaints to Mr. Marshall and Superintendent Brown were "at least a motivating factor in [Mr. Marshall's] decision to take the retaliatory action." *Id.* There is no direct evidence of Mr. Marshall's motive for taking part in spreading the confidential correspondence to other inmates and attempting to have Mr. Gibson assaulted. But the evidence taken in the light most favorable to Mr. Gibson shows "a chronology of events from which retaliation could be inferred." *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009).

Mr. Gibson agreed to provide information to internal affairs, but part of that agreement was that his cell would not be searched. Nevertheless, with Mr. Marshall's knowledge, his cell was searched and he was found guilty in a prison disciplinary proceeding of possessing contraband. Then, when Mr. Gibson complained to Superintendent Brown and Mr. Marshall about what he believed was a violation of their agreement, Mr. Marshall sent a confidential response to another inmate's cell using the incorrect mail procedure. Shortly thereafter, Mr. Gibson's letters were also circulating among other inmates. Moreover, Mr. Marshall's responses to Mr. Gibson's letters reveal his significant frustration with Mr. Gibson. As detailed at length above, the situation regarding the confidential correspondence and Mr. Gibson's safety only worsened, and Mr. Marshall even intentionally handed out the correspondence and requested that other inmates assault Mr. Gibson. Although all of Mr. Marshall's conduct could have been driven by his general

animosity toward Mr. Gibson rather than in retaliation for his First Amendment activity, a reasonable jury could conclude that it was at least in part driven by the latter.

Mr. Gibson adduced sufficient evidence showing that Mr. Marshall violated his First Amendment rights. The Court turns then to the second qualified immunity element—whether the right at issue was clearly established at the time of the violation." *Rooni*, 742 F.3d at 742 (citation omitted). As with Mr. Gibson's Eighth Amendment claim against Mr. Marshall, the unconstitutionality of Mr. Marshall's conduct was "obvious." *Ault*, 634 F.3d at 946. "[I]t would have been clear to a reasonable officer," *Ziglar*, 137 S. Ct. at 1867, that in response to complaints to prison officials, it is unlawful to purposefully place the inmate at risk of assault and to encourage such an assault in order to deter such complaints. Mr. Marshall is thus not entitled to qualified immunity on Mr. Gibson's First Amendment claim.

## IV.
## Conclusion

For the reasons explained, the defendants' motion for summary judgment, Dkt. No. 113, is **granted in part** and **denied in part**. Superintendent Brown is entitled to qualified immunity on Mr. Gibson's First and Eight Amendment claims, while Mr. Marshall is not. Superintendent Brown is entitled to judgment in his favor as to all claims brought against him. No partial final judgment shall issue at this time.

Mr. Gibson's claims against Mr. Donaldson and Mr. Marshall shall proceed in this action. The Magistrate Judge is requested to set this matter for a telephonic status conference to discuss the further development and resolution of this action, whether by settlement or trial.

**IT IS SO ORDERED.**

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Date: 2/6/18

Distribution:

LIONEL GIBSON
104608
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Inmate Mail/Parcels
3038 W. South 250
Bunker Hill, IN 46914

Electronically Registered Counsel

Magistrate Judge Matthew P. Brookman